CIVIL RIGHTS AND DISCRIMINATION – HOUSING —
APPLICABILITY OF FAIR HOUSING AMENDMENTS ACT TO
GROUP HOME NOTICE AND HEARING REQUIREMENTS


July 30, 1993


*The Honorable Nelson Sabatini*
*Secretary of Health and Mental Hygiene*

You have requested our opinion regarding the effect of the federal Fair Housing Amendments Act ("FHAA") on certain aspects of the licensing process for group homes for the mentally ill or developmentally disabled.

In an opinion issued in 1990, we concluded that the public notice and public hearing requirements of Titles 7 and 10 of the Health-General Article, Maryland Code ("HG" Article), did not violate the FHAA, although we advised that hearings under HG Title 10 had to be limited in various ways to avoid problems under the federal law. 75 *Opinions of the Attorney General* 291 (1990).[1]

Your inquiry about the current legality of the notice and hearing requirements is prompted by a recent decision of the United States District Court for the District of Maryland that struck down the notice and hearing requirements in the group home regulations of Montgomery County. *Potomac Group Home Corp. v. Montgomery County*, 823 F. Supp. 1285 (1993).

In our view, the decision in *Potomac Group Homes* is a development in the law that causes us to overrule the conclusions in our 1990 opinion. The rationale of the federal court compels us to conclude that if the Department continued to enforce the notice and

---

[1] Apart from the 1990 opinion, we have addressed FHAA issues in 78 *Opinions of the Attorney General* 40 (1993) (certain fire safety requirements unrelated to the specific needs and abilities of a group home's residents violate the FHAA) and 74 *Opinions of the Attorney General* 164 (1989) (siting requirements for group homes violate the FHAA).

hearing requirements in HG Titles 7 and 10, the Department would violate the FHAA.

# I

## Notice and Hearing Requirements

HG Title 7, the Developmental Disabilities Law, requires that when an application for a certificate of approval for a private group home is filed, "the Secretary shall hold a public hearing on the application." HG §7-611(b). HG §7-611 also contains the following provisions for public notice of the hearing:

(c) (1) The Secretary shall publish a notice of the hearing within 60 days of receipt of the completed application.

(2) The notice shall state:

(i) The name of the applicant;

(ii) The type of approval that is sought;

(iii) The location of the proposed private group home; and

(iv) The time and place that the Secretary sets for the hearing, which shall be at least 7 but not more than 15 days after the last publication of the notice.

(d) The notice shall be published at least twice in 1 week:

(1) In 2 newspapers published in the county where the private group home is to be located;

(2) If only 1 newspaper is published in that county, in that newspaper; or

(3) If a newspaper is not published in that county, any newspaper with substantial circulation in that county.

HG Title 10, the Mental Hygiene Law, contains a similar requirement that "the Secretary ... hold a public information hearing on [an] application" for the licensure of a private group home. The hearing is to be held "in the county where the private group home is to be located and as close as possible to the proposed location." HG §10-520(b)(2). The requirements for newspaper publication of a notice of the hearing are substantially similar to the requirements in the Developmental Disabilities Law. *See* HG §10-520(c).[2]

In 75 *Opinions of the Attorney General* 291 (1990), we addressed the status of the hearings required by HG Titles 7 and 10 under the FHAA:

> [We cannot] conclude that the mere holding of a public hearing necessarily violates the federal Act. A decision on whether to grant a license is best made after a decisionmaker has as much pertinent information as possible. A public hearing is a reasonable means of acquiring information. We know of no Fair Housing Act case suggesting that hearings are per se impermissible.

75 *Opinion of the Attorney General* 291 at 294. The opinion then focused on the manner in which hearings were held and concluded that, while the nature of the hearings under HG Title 7 conformed to the FHAA, certain modifications of the hearing process under HG Title 10 were necessary. 75 *Opinion of the Attorney General* 304.

---

[2] HG §10-520(a)(2) also provides for notice to the governing body for the county and the municipality and the General Assembly delegation from the district where the private group home is to be located.

## II

### The *Potomac Group Home* Case

In *Potomac Group Home Corp. v. Montgomery County*, 823 F. Supp. 1285 (1993), a provider of group homes for elderly persons with disabilities and two residents of one of the homes challenged certain aspects of the licensing procedure adopted by Montgomery County for these group homes. Under the county ordinance, group home providers must send letters to each neighboring property owner of a proposed group home site, both adjacent and opposite, as well as to neighborhood civic organizations. In these letters, the provider is required to notify these individuals and groups of its "plans to operate a group home on the site," as well as certain details about the type of person who will live there. 823 F. Supp at 1289. As the court pointed out, "no other county law or regulation imposes any similar requirement on a residence to be occupied by adult persons who do not have disabilities." *Id.*

The court found that such notices "have consistently provoked negative reactions from neighbors of the proposed group homes. Neighbors in the communities typically responded with an outpouring of hostility vented by way of a letter writing campaign opposing the proposed group home." 823 F. Supp at 1290. Such letters typically speak of a "lowering of property values." *Id*.

Montgomery County's procedures also call for applications for group home licensing to be reviewed and evaluated by a "program review board." Unlike the process under HG Titles 7 and 10, these review hearings were not conducted routinely. Instead, they were held "whenever neighbors of a group home are particularly vocal in their opposition to the proposed home." 823 F. Supp. at 1291.

Although the county insisted that the program review boards were limited to "programmatic concerns," like the worth of the services of the group home provider, residents of the community who appeared at review board hearings consistently presented statements opposing the group homes. The statements included "stereotypical views" of the people with disabilities who would live in the group homes. 823 F. Supp. at 1290.

In granting the plaintiffs' motion for summary judgment, the federal court held that both the notice and hearing requirements of the county's procedures violated the FHAA.[3]

### A. Notice

With respect to the "neighbor notification requirement," the federal court held it to be "facially invalid, unless supported by a legitimate governmental interest," because it was a requirement not imposed on any family residential unit other than those to be occupied by people with disabilities. 823 F. Supp. at 1296. The court concluded "that no rational basis or legitimate governmental interest supports the neighbor notification requirement." *Id.*

The county asserted that it did have a legitimate interest underlying the notification requirement: to help the group home become a part of the community. But the court rejected this justification, holding that "a purportedly benign purpose of a facially discriminating ordinance is irrelevant to a determination of the lawfulness of the legislation." *Id.* The problem with the notification, the court continued, is that it necessarily assumes "that people with disabilities were different than people without disabilities and must take special steps to 'become a part of the community.' This requirement is equally as offensive as would be a rule that a minority family must give notification and invite comment before moving into a predominantly white neighborhood." 823 F. Supp. at 1296.

Furthermore, the court held, the effect of sending out the notification is not to help integrate the group home residents into the community. Rather, "notices of this sort galvanize neighbors in their opposition to the homes." *Id.* Relying on evidence in the record of the case, the court found that "the neighbor notification process has caused a great deal of harm to the plaintiffs, provoking petitions and letter writing campaigns in opposition to the proposed group homes. The resulting stigma to [the] plaintiffs ... and other residents of [the] group homes is not easily erased." 823 F. Supp. at 1296.

---

[3] Other issues in the case were not resolved by the court. Thus, an appeal is not yet possible. The county, we are told, has not decided whether to appeal in any event.

### B.    Hearings

With respect to hearings before the program review boards, the federal court held that the requirement did not violate the FHAA on its face.  *Id*.  But the court then went on to explain why the requirement had a discriminatory effect and therefore violated the FHAA as applied.  First, the hearings have a stigmatizing effect:

> Like the neighbor notification rule, program review board hearings are held under the challenged requirement only for residential facilities for the disabled.  No other type of residential home in Montgomery County is subject to public scrutiny of this sort.

823 F. Supp. at 1297.

Second, the stigmatizing effect is compounded by "[t]he community concerns and community prejudices [that] often dominate these hearings ...."  823 F. Supp. at 1297.  Although the court acknowledged that the Montgomery County officials who administer the program "themselves may not harbor prejudices of this sort against the handicapped elderly, they have designed and utilized a regulatory procedure which facilitates the expression of these prejudices and which gives weight to such views in the process."  *Id.*  This discriminatory effect was aggravated by the way in which Montgomery County held these hearings.   The neighborhood organizations themselves are represented by at least one board member, whose comments cause the board to stray beyond legitimate programmatic issues.  In this way, the hearings give "undue weight to the opinions of the neighbors ...."   *Id.*  Furthermore, "what makes the discriminatory effect particularly egregious in this case is that hearings are consistently held because of public opposition to the group homes and for the purpose of appeasing neighboring residents.  This particular procedural step, which is based essentially on illegal prejudices of the community, causes great harm to plaintiffs because of resulting delays and burdensome costs."  823 F. Supp at 1298.

In considering whether Montgomery County had any legitimate interest in continuing its hearing requirement, the court held that the hearing process was neither a necessary nor an effective

way of gathering legitimate information about programmatic concerns:

> The record in this case reveals that defendants can, and frequently do, review providers' program statements without even holding a public board hearing .... Moreover, evidence of record indicates that neighborhood representatives as a group have no particular expertise concerning programmatic issues, such as the type of care which should be provided and the appropriate staffing for a particular group home. Rather than assisting defendants in assessing the programmatic aspects of a provider's statement, neighborhood representatives most often direct the attention of licensing officials away from legitimate concerns. As such, it is apparent to the Court that any legitimate regulatory interest of defendants in reviewing a provider's program by way of holding a public hearing of this sort is minimal.

823 F. Supp. at 1298. The court concluded as follows:

> [T]he board hearing requirement, as applied in this case, is perhaps the *most* discriminatory method available for reviewing a provider's program statement. As discussed hereinabove, defendants often review a provider's statement without holding a public hearing. Furthermore, neighbors as a group have no particular expertise which might be useful in assisting licensing officials in their review of the statements of prospective group home providers. To the extent that the hearings address legitimate programmatic matters, there are less discriminatory alternatives available to satisfy the County's legitimate concerns.... If the defendants need information from a provider regarding its

program statement, "there are less formal means to obtain it."

823 F. Supp at 1299 (emphasis in original, citation omitted).

## III

### Implications for State Procedures

The Montgomery County procedures held unlawful in *Potomac Group Home* and the State procedures in HG Titles 7 and 10 are not identical. Under State procedures, notice is given by general publication, not focused on the neighbors of the proposed group home. Public hearings are routine, not triggered by community opposition. No community representative participates in the decision-making process. Despite these differences, we think it highly likely that the federal court would reach the same conclusions about the State notice and hearing requirements as it did about the county's.

#### A. Notice

Because the notice requirements are not applied to group residences other than those to be occupied by persons with disabilities, the federal court would likely conclude that the effect of the notice requirements is to stigmatize the group home residents because of their disabilities. Moreover, although a trial yields a factual record and preparation of an Attorney General's opinion does not, we have reason to think that notice to the public and to elected officials about applicants for a State license, like notice about applicants for a county license, often has had the effect of galvanizing neighborhood opposition to a group home. A plaintiff in a federal court action against the Department would almost surely present substantial evidence of the ways in which people with disabilities are harmed by the notice requirement in HG §§7-611 and 10-520.

We discern no argument that would persuade the federal court to reach a different result than in *Potomac Group Home*. The notice requirements in HG §§7-611 and 10-520 would be held to violate the FHAA.

### B.    *Hearings*

Because the facts about Montgomery County's hearing process were so "egregious," as the court put it, we would have more room to defend the hearing procedures in HG §§7-611 and 10-520.[4] Still, a plaintiff would surely be able to show that opponents of group homes attempt to use the hearings to voice stereotypical views of people with disabilities, even though the Department rigorously excludes illegitimate concerns from its own decision-making. *See Stewart B. McKinney Found., Inc. v. Town Plan & Zoning Comm'n*, 790 F. Supp. 1197, 1211-12 (D. Conn. 1992) (use of "public information forum" as instrument of neighborhood opposition).

One key passage in the federal court decision, moreover, quoted on page 51 above, focuses on the availability of alternative ways of gathering necessary information. The Department has less formal means than a public hearing to obtain the information that it deems necessary before approving an application, and nothing in *Potomac Group Home* precludes a thorough investigation of the ability of the applicant to provide proper care. 823 F. Supp. at 1299. If, as we think likely, the Department would be unable to show that the hearing process itself yielded material information *both* permitted to be considered by the FHAA *and* unavailable by any other means, then the result would be the same as in *Potomac Group Home*:  A hearing required of people with disabilities, but not of people without disabilities in comparable residential settings, violates the FHAA.

### IV

### Conclusion

Judge Harvey's decision in *Potomac Group Home* is not an isolated view of the FHAA that we could expect to be reversed on appeal (if one is taken).  Rather, the decision reflects a

---

[4] If public notice cannot be given because of the FHAA, an attempt to defend the hearing requirement would seem pointless, however.  An unannounced "public" hearing serves no purpose.

pattern of decisions in the federal courts striking down requirements that, on their face or in practical effect, make it harder for people with disabilities to live where they want to.[5]

In our opinion, continued enforcement of the notice and hearing requirements in HG Titles 7 and 10 would likely result in a federal court decision holding these requirements violative of the FHAA. We recommend that the matter be brought to the attention of the General Assembly at the next session and, until the statute is amended, that applications be considered and approved, if they are in compliance with regulatory requirements, without publication or provision of notice and without public hearings.

J. Joseph Curran, Jr.
*Attorney General*

Jack Schwartz
*Chief Counsel*
 *Opinions & Advice*

**Editor's Note***:*

The *Potomac Group Home* decision was not appealed.

---

[5] *See, e.g., Marbrunak, Inc. v. City of Stow*, 974 F.2d 43 (6th Cir. 1993) (fire safety requirements); *Oxford House, Inc. v. Town of Babylon*, 819 F. Supp. 1179 (E.D.N.Y. 1993) (application of "family" restriction in zoning code); *Horizon House Develop. Serv., Inc. v. Township of Upper Southampton*, 804 F. Supp. 683 (E.D. Pa. 1992) (spacing requirement); *Stewart B. McKinney Found., Inc. v. Town Plan & Zoning Comm'n*, 790 F. Supp. 1197 (D. Conn. 1992) (special exception procedure); *Association of Relatives & Friends v. Regulations & Permits Admin.*, 740 F. Supp. 95 (D.P.R. 1990) (denial of special use permit).